**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **IN RE: KUGEL MESH HERNIA REPAIR PATCH LITIGATION** | § | **MDL Docket No. 07-1842-ML** |
| **THIS DOCUMENT RELATES TO:** | § | **Chief Judge Mary M. Lisi** |
| Alford, No. 1:07-cv-01963-ML-LDA | § | |
| Edgar, No. 1:07-cv-01849-ML-LDA | § | |
| McNair, No. 1:07-cv-01863-ML-LDA | § | |
| Tompkins, No. 1:07-cv-00191-ML-LDA | § | |
| Jones, No. 1:07-cv-01921-ML-LDA | § | |
| Collins, No. 1:07-cv-01912-ML-LDA | § | |
| Swallow, No. 1:07-cv-00426-ML-LDA | § | |
| Hyland, No. 1:07-cv-01851-ML-LDA | § | |
| Smith, No. 1:07-cv-01937-ML-LDA | § | |
| Wilkins, No. 1:07-cv-01870-ML-LDA | § | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION SEEKING *EX PARTE* CONTACTS WITH PLAINTIFFS' TREATING PHYSICIANS**

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. APPLICABLE LAW REGARDING *EX PARTE* COMMUNICATIONS ..... 3

A. Federal courts apply state law regarding the scope and nature of the physician-patient privilege. ..... 3

B. The Question is Not the Existence of a Waiver of the Physician-patient Privilege, but the Scope of that Waiver ..... 4

C. The Court must First Determine if a State Permits *Ex Parte* Contacts. If so, the Court should Balance the Benefits of those Communications against Public Policy and Privacy Interests. ..... 5

D. MDL Courts Rightfully Exercise Precaution When Determining Whether to Allow Informal Discovery by *Ex Parte* Communication. ..... 8

E. Courts Around the Country have Denied Similar Requests and for Good Reason. ..... 11

F. The Principles of HIPAA Prohibit *Ex Parte* Communications ..... 12

III. PUBLIC POLICY CONSIDERATIONS ..... 14

A. The Sanctity and Trust of the Physician-patient Relationship Discourages these Unnecessary *Ex Parte* Communications. ..... 14

i. The code of ethics recognizes the right to privacy absent a patient's consent. ..... 14

ii. There is a chance of collusion and unintentional waivers of privilege. ..... 15

B. *Ex Parte* Communications Could Expose Physicians to Potential Civil Liability. ..... 16

IV. DEFENDANTS' ARGUMENTS FAIL ..... 17

A. Defendants' Due Process Rights are Not in Danger. ..... 17

B. There are No Real Savings and Any Potential Savings in Cost is Far Outweighed By Plaintiffs' Privacy Interests. ..... 18

C. Defense Counsel's Work Product is Not at Risk. ..... 19

D. Plaintiffs Should Not be Prevented from Contacting their own Physicians. ..... 20

V. CONCLUSION ..... 21

# TABLE OF AUTHORITIES

## Cases

*Accord Toll Bros., Inc. v. Dryvit Sys., Inc.*,
432 F.3d 564 (4th Cir. 2005) .......... 5, 21
*Alexander v. Knight*,
177 A.2d 142 (Pa. 1962) .......... 22
*Alston v. Greater S.E. Cmty. Hosp.*,
107 F.R.D. 35 (D.D.C. 1985) .......... 15, 16, 26
*Anker v. Brodnitz*,
98 Misc. 2d 148 (N.Y. Misc. 1979) .......... 10, 23
*Arons v. Jutkowitz*,
Nos. 147, 148, 153, 2007 N.Y. LEXIS 3355 (N.Y., November 27, 2007) .......... 10
*Ayala-Gerena v. Bristol Myers-Squibb Co.*,
95 F.3d 86, 91 (1st Cir. 1996) .......... 11
*Benally v. United States*,
216 F.R.D. 478 (D. Ariz. 2003) .......... 4, 16
*Brandt v. Med. Def. Assocs.*,
856 S.W.2d 667 (Mo. banc 1993) .......... 10
*Brandt v. Pelican*,
856 S.W.2d 658 (Mo. banc 1993) .......... 9, 10
*Buffington v. Wood*, 351 F.2d 292, 299 (3d Cir. 1965) .......... 11
*Coutee v. Global Marine Drilling Co.*,
895 So. 2d 631 (La. Ct. App. 3d Cir. 2005) .......... 8
*Crist v. Moffatt*,
389 S.E.2d 41 (N.C. 1990) .......... 9, 15, 16, 25
*Doe v. Eli Lilly & Co.*,
99 F.R.D. 126 (D.D.C. 1983) .......... 26
*Duquette v. Superior Court*,
778 P.2d 634 (Ariz. Ct. App. 1989) .......... 15
*Equal Opportunity Commission v. Boston Mkt. Corp.*,
CV 03-4227, 2004 U.S. Dist. LEXIS 27338 (E.D.N.Y. Dec. 16, 2004) .......... 19
*Eve v. Sandoz Pharm. Corp.*,
IP 98-1429-C-Y/S, 2002 WL 32153352 (S.D. Ind. May 16, 2002) .......... 7, 26
*Evertson v. Dalkon Shield Claimants Trust*,
No. 82-1021-MLB, 1993 WL 245972 (D. Kan. June 2, 1993) .......... 7
*Garner v. Ford Motor Co.*,
61 F.R.D. 22 (D. Alaska 1973) .......... 15, 16, 17
*Gobuty v. Kavanagh*,
795 F. Supp. 281 (D. Minn. 1992) .......... 15, 16
*Hammonds v. Aetna Cas. & Sur. Co.*,
243 F.Supp. 793, 799 (N.D.Ohio 1965) .......... 22
*Hancock v. Dobson*,
958 F.2d 1367 (6th Cir. 1992) .......... 4, 26
*Hickman v. Taylor*,
329 U.S. 495 (1947) .......... 26

*Horner v. Rowan Companies, Inc.*,
153 F.R.D. 597 (S.D. Tex. 1994) ... 8, 16
*IBM v. Edelstein*,
526 F.2d 37 (2d. Cir. 1975) ... 26
*In re Baycol Prods. Litig.*,
219 F.R.D. 468 (D. Minn. 2003) ... 1, 5, 13, 23
*In re Grand Jury Subpoena Dated November 8, 1979*,
622 F.2d 933 (6th Cir. 1980) ... 26
*In re Human Tissue Prods. Liab. Litig.*,
No. 2:06-135 (D.N.J.), MDL No. 1763, Order of September 11, 2006 ... 2, 13
*In re Tempromandibular Joint (TMJ) Implants Prods. Liab. Litig.*,
97 F 3d 1050 (8th Cir. 1996) ... 5
*In re Vioxx Prods. Liab. Litig.*,
230 F.R.D. 470 (D. La. 2005) ... 18
*In re Vioxx Prods. Liab. Litig.*,
230 F.R.D. 473 (E.D. La. 2005) ... passim
*Jaap v. Dist. Court*,
191 Mont. 319, 623 P.2d 1389 (Mont. 1981) ... 15, 27
*Johns v. United States*,
Civ. Act. No. 96-1058, 1997 U.S.Dist.LEXIS 17979 (E.D. La. Nov. 6, 1997) ... 8, 16, 17
*Johnson v. Dist. Ct. of Okla. County*,
738 P.2d 151 (Okla. 1987) ... 16
*Karsten v. McCray*,
509 N.E.2d 1376 (Ill. App Ct. 1987) ... 24
*Keplinger v. Virginia Electric. & Power Co.*,
537 S.E.2d 632 (W.Va. 2000) ... 7
*Law v. Zuckerman*,
307 F.Supp.2d 705 (D.Md. 2004) ... 18
*Loudon v. Mhyre*,
756 P.2d 138 (Wash. 1988) ... 16, 24
*Luna v. Kennett HMA, Inc.*,
1:07CV00043, 2007 U.S. Dist. LEXIS 92410 (E.D. Mo. Dec. 17, 2007) ... 10
*MacDonald v. United States*,
767 F. Supp. 1295 (M.D. Pa. 1991) ... 4
*Manion v. N.P.W. Med. Ctr.*,
676 F. Supp. 585 (M.D. Pa. 1987) ... 15, 21
*Miles v. Farrell*,
549 F. Supp. 82, 84 (N.D. Ill. 1982) ... 15, 16, 22
*Morris v. Consol. Coal Co.*,
446 S.E.2d 648 (W. Va. 1994) ... 9
*Neal v. Boulder*,
142 F.R.D. 325 (D. Colo. 1992) ... 6, 15, 16
*Nelson v. Lewis*,
534 A.2d 720, 723 (N.H.1987) ... 23, 25
*Neubeck v. Lundquist*,
186 F.R.D. 249 (D. Me. 1999) ... 4, 15

*Perkins v. United States*,
877 F. Supp. 330 (E.D. Tex. 1995) ........ 8, 22
*Petrillo v. Syntex Laboratories, Inc.*,
499 N.E.2d 952, 956 (Ill. App. Ct. 1986) ........ 23
*Pourchot v. Commonwealth Edison Co.*,
587 N.E.2d 589, 591 (Ill. App. Ct. 1992) ........ 15
*Roosevelt Hotel Ltd. Partnership v. Sweeney*,
394 N.W.2d 353 (Iowa 1986) ........ 15, 21
*Schwartz v. Goldstein*,
508 N.E.2d 97 (Mass. 1987) ........ 15
*Scott by & Through Scott v. Flynt*,
704 So. 2d 998 (Miss. 1996) ........ 27
*Scott v. Drivers Mgmt., Inc.*,
714 N.W.2d 23 (Neb. Ct. App. 2006) ........ 9
*Smith v. Am. Home Prods. Corp. Wyeth-Ayerst Pharm.*,
855 A.2d 608 (N.Y. Super. Ct. Law Div. 2003) ........ 14
*Smith v. Ashby*,
743 P.2d 114 (N.M. 1987) ........ 24
*Soehnlen v. Aultman Hosp.*,
No. 5:06 CV 1594, 2007 U.S. Dist. LEXIS 33064 (N.D. Ohio 2007) ........ 4
*Sornsen v. Barbuto*,
143 P.3d 295 (Utah Ct. App. 2006) ........ 9
*South Carolina Med. Ass'n v. Thompson*,
327 F.3d 346, 348 (4th Cir. 2003) ........ 17
*State ex rel. Kitzmiller v. Henning*,
437 S.E.2d 452 (W. Va. 1993) ........ 8, 9
*State ex rel. Woytus v. Ryan*,
776 S.W.2d 389, 394 (Mo. 1989) ........ 24
*Stewart v. Women in Cmty. Serv.*,
CV-N-97-234, 1998 U.S. Dist. LEXIS 17741, 4-5 (D. Nev. 1998) ........ 16
*Stoller v. Moo Young Jun*,
118 A.D.2d 637 (N.Y. App. Div. 1986) ........ 10
*Torres v. Superior Court*,
221 Cal. App. 3d 181 (Cal. Ct. App. 1990) ........ 15
*Weaver v. Mann*,
90 F.R.D. 443 (D.N.D. 1981) ........ 1, 15, 16
*Wenninger v. Muesing*,
240 N.W.2d 333 (Minn. 1976) ........ 22
*West v. American Tel. & Tel. Co.*,
311 U.S. 223, 236 (1940) ........ 9
*Williams v. Rene*,
72 F.3d 1096, 1103 (3rd Cir. 1995) ........ 26

**Rules**

1320d-3(a)-(b) ........ 10
1320d-4(b) ........ 10
42 U.S.C. § 1320d ........ 17

42 U.S.C. § 1320d-2(d)(2)(A) & (B)(ii) ... 17
42 U.S.C. § 1320d-7(a)(1) ... 18
42 U.S.C. §§ 1320d-1(d) ... 10
45 C.F.R. § 160.203(b) ... 18
45 C.F.R. § 164.508(a)(1) ... 27
45 C.F.R. § 164.512(e) ... 10
65 Fed. Reg. 82462 (Dec. 28, 2000) ... 17
*Fed. Rule Evid. R. 501* ... 3
Federal Rule of Evidence 501 ... 4
Health Insurance Portability and Accessibility Act of 1996 ... 17
HIPAA Privacy Rules ... 10
Louisiana Code of Civil Procedure ... 8

In opposition to Defendants' Motion Seeking *Ex Parte* Contacts With Plaintiffs' Treating Physicians, Plaintiffs state as follows:

## I. INTRODUCTION

Defendants ask this Court to permit them to conduct *ex parte* communications with Plaintiffs' past and present treating physicians in the eight states where Plaintiffs live in the ten cases selected for ADR (Texas, Louisiana, West Virginia, North Carolina, Missouri, Utah, Nebraska and New York). *Ex parte* communications between defense counsel and Plaintiffs' treating physicians undermine the physician-patient relationship; sanction the release of confidential information without safeguards; place defense counsel and doctor in a potential conflict of interest; and encourage doctors to become experts against their patients. Yet, these communications provide no information that cannot be gathered through formal discovery under the Rules of Civil Procedure.

Defendants ask this Court to bless an open-ended, unlimited and ungoverned questioning of Plaintiffs' treating physicians – a request that has been repeatedly denied by courts across this Country. Nothing in the Rules of Civil Procedure authorizes such an order. *Weaver v. Mann*, 90 F.R.D. 443, 445 (D.N.D. 1981) ("the practice of engaging in private conversations with plaintiff's physicians is not contemplated by the federal rules"); *see also, In re Baycol Prods. Litig.*, 219 F.R.D. 468, 473 (D. Minn. 2003). In addition, Defendants have failed to identify a single piece of information which they will be able to obtain through *ex parte* conference that cannot be obtained through conventional discovery. Nor have Defendants identified any real basis for why this kind of contact is even justified. Given the complex nature of this case, the conflicts among the applicable substantive law of the States and the expedited discovery process already implemented by the Court, this request offers no benefit that would justify the privacy violations and numerous other procedural problems it will create.

In sum, Plaintiffs assert a privilege based upon recognized privacy rights and strong public policy, whereas, Defendants simply request the use of a non-conventional discovery device – one that they have no recognized right to or privilege protecting. In the interests of efficiency, uniformity and equity, this Court's opinion should be applicable to all of the Plaintiffs in this MDL. Under the privilege law of the majority of states, the requested *ex parte* communications are strictly prohibited. If *ex parte* communications are allowed between Defendants and treating physicians in those cases, the Plaintiffs' privileges will be forsaken and their doctors will be exposed to liability. As for the cases filed in states allowing *ex parte* contacts – nothing *requires* the Court to permit this informal discovery tool and other courts handling similar MDL proceedings have rejected the defendant's effort to engage in this kind of behavior. *See, e.g., In re Vioxx Prods. Liab. Litig.*; *In re Baycol Prods. Litig.; In re Prempro Prods. Liab. Litig.*; *In re Human Tissue Prods. Liab. Litig.*, (cited herein). While allowing *ex parte* contacts in the states precluding them violates a patient's privileges, prohibiting *ex parte* contacts in the states allowing them does not violate any recognized right guaranteed to Defendants. The fact that *ex parte* contacts with physicians may be permitted in New York, for example, ignores the greater issue here: the purpose of the MDL process is to streamline litigation and afford a uniform and efficient discovery process. Indeed, it is clear that the Court is empowered to design that discovery process in the best interests of the litigation as a whole and can prohibit or allow discovery techniques and devices as it sees fit. Plaintiffs respectfully submit that the only ruling that may be uniformly applied to all of the cases in this MDL is to prohibit *ex parte* communications between Defendants and Plaintiff's treating physicians in all of the cases.

Moreover, *ex parte* contacts between defense counsel and Plaintiffs' treating physicians will not lead to greater efficiency. Their prohibition will not violate Defendants' due process rights or risk disclosure of attorney work product. The trust that *must* exist between a patient and her

physician should be preserved. As such, Plaintiffs respectfully request that this Court deny Defendants' motion and enter an order prohibiting *ex parte* communications between defense counsel and Plaintiffs' treating physicians in all of the actions in this MDL.

## II. APPLICABLE LAW REGARDING *EX PARTE* COMMUNICATIONS

### A. Federal courts apply state law regarding the scope and nature of the physician-patient privilege.

In pertinent part, Federal Rule of Evidence 501 states:

> [I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

*Fed. Rule Evid. R. 501.*

Consequently, since jurisdiction over the claims in this litigation is based upon diversity of citizenship (and not upon a federal question), state law dictates the existence and scope of any physician-patient privilege.[1] *Benally v. United States*, 216 F.R.D. 478, 480 (D. Ariz. 2003) ("This Court interprets Federal Evidence Rule 501 to direct that the Court apply the state law of privilege to discovery issues when state law provides the rule of decision in the case as a whole. Accordingly, this Court holds that Arizona law dictates the existence and scope of the physician-patient privilege in this case").[2] This rule has been applied by a district court sitting in the First Circuit. *Neubeck v.*

---

[1] Defendants cite to *Hancock v. Dobson*, 958 F.2d 1367 (6th Cir. 1992), for the assertion that "[t]here is no federal physician-patient privilege that would prevent the *ex parte* contact sought here." Defs' Brief, p. 3. That is beside the point. Federal Rule of Evidence 501 clearly directs that state law delineates the type and scope of privileges in civil actions subject to state substantive law – as here. In *Hancock*, the court was applying Federal Common Law because the case was before the court pursuant to federal question jurisdiction. *See Id. Hancock* was recently explained in *Soehnlen v. Aultman Hosp.*, where the Northern District of Ohio held: "the choice of law favoring the application of federal law on privilege to the supplemental state claims from [*Hancock*], does not apply since this case was not removed on the basis of federal question jurisdiction. *Soehnlen v. Aultman Hosp.*, No. 5:06 CV 1594, 2007 U.S. Dist. LEXIS 33064 (N.D. Ohio 2007).

[2] *See also, MacDonald v. United States*, 767 F. Supp. 1295, 1298 n.3 (M.D. Pa. 1991) (state law controls whether *ex parte* interviews are permitted), aff'd without decision, 983 F.2d 1051 (3d Cir. 1992).

*Lundquist*, 186 F.R.D. 249, 251 (D. Me. 1999)("to preserve the integrity of the physician-patient privilege", and to avoid putting the physician in a position of having to decide a legal issue regarding the extent to which privilege has been waived, Maine law prohibits defense counsel from *ex parte* contact with decedent's treating physician – contacts are to be through formal discovery or after notification to and approval by plaintiff).

MDL courts have recognized that the existence of a privilege, or other substantive state law, is governed by "the state law that would have applied to the individual cases had they not been transferred for consolidation." *In re Tempromandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F 3d 1050, 1055 (8th Cir. 1996).[3] The MDL court in *Baycol* addressed this very question, holding: "[t]here is no physician-patient privilege in federal diversity actions. For federal cases based on diversity jurisdiction, state law controls the existence and scope of the physician-patient privilege." *In re Baycol Prods. Litig.,* 219 F.R.D. 468, 469 (D. Minn. 2003) (citations omitted)(refusing to allow *ex parte* communications in national MDL). Therefore, for each of the ten cases involved in the Court's early resolution process - and eventually for each case transferred to this MDL – the Court must apply the forum state's physician-patient privilege law when determining if *ex parte* communications of this nature are even permitted. Even if state law permits such contacts, however, the Court still can, and should, use its inherent discretion to manage discovery to limit such contacts as the surrendering of Plaintiffs' privacy interests is not justified by any real gain in efficiency.

**B. The Question is Not the Existence of a Waiver of the Physician-patient Privilege, but the Scope of that Waiver.**

Plaintiffs are not disputing that they have put their physical condition at issue. Plaintiffs also do not dispute that, by putting their physical condition at issue, the relevant *medical information* in the hands of their treating physicians may be discovered. However, this waiver is not absolute. It does

[3] *Accord Toll Bros., Inc. v. Dryvit Sys., Inc.*, 432 F.3d 564, 568 n.4 (4th Cir. 2005).

not result in a complete abrogation of the physician-patient privilege. Indeed, most states do not extend this waiver so far as to encompass *ex parte* interviews with the plaintiff's treating physicians. *See, e.g., Neal v. Boulder,* 142 F.R.D. 325, 328 (D. Colo. 1992)("the doctor-patient privilege is not completely abrogated when plaintiff chooses to commence litigation.").[4]

**C. The Court must First Determine if a State Permits *Ex Parte* Contacts. If so, the Court should Balance the Benefits of those Communications against Public Policy and Privacy Interests.**

Because this is a question of substantive law, for each forum state, the first question is whether such contacts would even be allowed under the privileges laws of the state at issue. Only when *ex parte* contacts are not expressly prohibited can a court then ask whether the considerations against allowing such contact, discussed below, outweigh the benefit the defendant may gain as a result of allowing this discovery tool.[5]

In Section I(B) of their brief, Defendants assert that "[i]n the eight states implicated by this motion, state law does not preclude *ex parte* contacts with treating physicians." Defs' Brief, p. 5. Defendants first acknowledge that "each of the eight states of residence recognizes some form of physician-patient privilege…", then simply cite to cases and statutes recognizing a limited waiver of

[4] In addition to citing opinions of federal courts, Plaintiffs cite to numerous decisions from state courts throughout this brief. This is because the physician-patient privilege is a creation of state substantive law and federal courts routinely refer to and interpret those decisions. Additionally, as cases from jurisdictions across the nation have been consolidated before this Court (and more continue to be filed every day), this Court's ruling on *ex parte* communications between defense counsel and Plaintiffs' treating physicians will likely have broad implications on the litigation as a whole – beyond these ten cases selected for potential early resolution.

[5] Defendants attempt to avoid this truth by asserting that this motion pertains not to the scope of the physician-patient privilege, but to "how discovery may be obtained." Def's Brief, p. 2. Defendants cite only two cases on point in support of this argument, *Eve v. Sandoz Pharm. Corp.*, IP 98-1429-C-Y/S, 2002 WL 32153352 (S.D. Ind. May 16, 2002) and *Evertson v. Dalkon Shield Claimants Trust*, No. 82-1021-MLB, 1993 WL 245972 (D. Kan. June 2, 1993). However, in these two unreported decisions, the courts had determined that the law of the states (Indiana and Kansas) clearly did not recognize the patient-physician privilege under the circumstances. At the most, these two decisions support the argument that federal procedural rules can be considered only when there is a clear absence of a state statutory or common law privilege.

that privilege when a plaintiff files a personal injury lawsuit. *Id.* 5-6.[6] Defendants seem to assert that the very existence of this waiver makes *ex parte* contacts permissible. This is wrong.

Defendants fail to discuss the applicable law from each of these jurisdictions relating to the *scope* of that waiver and the manner in which relevant medical information may be obtained. Case law from the eight states of residence holds as follows:

**TEXAS – Prohibits *ex parte* contacts.** In *Horner v. Rowan Companies, Inc.*, 153 F.R.D. 597 (S.D. Tex. 1994), applying Texas law, the court recognized the waiver of the physician-patient privilege but condemned *ex parte* contacts. The court found that formal discovery simultaneously avoids problems and meets the need of the defense to acquire information. *Id.* at 602; *see also, Perkins v. United States*, 877 F. Supp. 330, 333-34 (E.D. Tex. 1995)("[D]efense lawyer may not contact *ex parte* a plaintiff's non-party treating physician without the plaintiff's authorization.")

**LOUISIANA – Prohibits *ex parte* contacts.** In *Johns v. United States*, Civ. Act. No. 96-1058, 1997 U.S.Dist.LEXIS 17979 (E.D. La. Nov. 6, 1997), interpreting Louisiana privilege law, the court held that the state statutes providing for waiver of the privilege in medical malpractice and personal injury cases specifically limited the means by which that information could be gathered. Specifically, the court held that the relevant information could "only be disclosed pursuant to one of the discovery methods authorized" by the Louisiana Code of Civil Procedure.[7] *Id.* at *8; *see also Coutee v. Global Marine Drilling Co.,* 895 So. 2d 631 (La. Ct. App. 3d Cir. 2005) *reversed on other grounds at* 924 So. 2d 112 (La. Feb. 22, 2006).

**WEST VIRGINIA – Prohibits *ex parte* contacts.** In *State ex rel. Kitzmiller v. Henning*, 437 S.E.2d 452 (W. Va. 1993), the court held that "[*e*]*x parte* interviews are prohibited because they pose the danger of disclosing irrelevant medical information that may compromise the confidential nature of the doctor-patient relationship without advancing any legitimate object of discovery." *Id.* 455. The court held that "the formal discovery methods provided in the West Virginia Rules of Civil

---

[6] None of the cases cited by Defendants – save one – deal with the scope of this waiver as it relates to *ex parte* communications between defendants and plaintiff's physician. The only case in this section (from one of the eight residence states) mentioning *ex parte* communications, *Keplinger v. Virginia Electric. & Power Co.*, 537 S.E.2d 632 (W.Va. 2000), addresses whether a lawyer's failure to comply with a statute relating to custody of hospital records can serve "as grounds for cause of action for tortious interference with a physician/patient relationship." *Id.* at 19. As evidenced below, citation to this inapposite case ignores clear West Virginia precedent. Moreover, Defendants' citation to *Weiss,* 2007 WL 2137782, is of little relevance to this motion, as it does not deal with the law of the residence states. In *Weiss*, the district court acknowledged that *ex parte* interviews were allowed by the common law of that state (Kentucky); however, the court refused to order plaintiffs to execute broad authorizations for *ex parte* interviews. As such, the court allowed *ex parte* communications, but limited the communications to the subjects in the medical records – and not confidential communications between plaintiff and physician.

[7] The court believed it did not have to engage in public policy debate – relevant here – because the Louisiana legislature had already decided the matter; stating: "The discovery limitations incorporated into the statutory waiver of a plaintiff's provider/patient privilege act as a substantive part of the State's privilege law," not merely as a matter of state procedure. *Johns*, 1997 U.S.Dist.LEXIS 17979. at *13-14.

Procedure set forth the exclusive means by which an adverse party may obtain pretrial discovery of medical testimony relating to a patient's medical condition. Private nonadversary interviews with a patient's attending physicians by the inquiring party's counsel are not contemplated under the Rules." *Id.* at 456; *see also, Morris v. Consol. Coal Co.*, 446 S.E.2d 648 (W. Va. 1994).

**NORTH CAROLINA – Prohibits *ex parte* contacts.** In *Crist v. Moffatt*, 389 S.E.2d 41 (N.C. 1990), the Supreme Court of North Carolina held that a plaintiff's waiver of the physician-patient privilege (by placing his condition at issue) does not include *ex parte* interviews of his physicians by defense counsel. These *ex parte* communications are prohibited by law without the plaintiff's consent.

**UTAH – Prohibits *ex parte* contacts.** In *Sornsen v. Barbuto*, 143 P.3d 295 (Utah Ct. App. 2006), the court held that "*ex parte* communication between a physician and opposing counsel constitutes a breach of the physician's fiduciary duty of confidentiality." *Id.* at 300.

**NEBRASKA – Might not prohibit *ex parte* contacts.** Without discussing the public policy and privacy interests involved, one Nebraska appellate court has held that, pursuant to state statute, the privilege does not apply. *Scott v. Drivers Mgmt., Inc.,* 714 N.W.2d 23, 35-36 (Neb. Ct. App. 2006). It appears the Nebraska Supreme Court has not ruled on the issue and, in interpreting state law, a federal court is not bound by intermediate appellate state court decisions if it believes that the highest court of the state would decide otherwise. *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 236 (1940). This is particularly true in light of HIPAA (see Section II(F) below).

**MISSOURI – Does not prohibit *ex parte* contacts, but a recent decision recognizes that this authority might be superseded by HIPAA.** The Missouri Supreme Court addressed the issue of *ex parte* communications with physicians in *Brandt v. Pelican*, 856 S.W.2d 658 (Mo. banc 1993): holding that the physician-patient privilege did not preclude physicians from sharing a patient's medical conditions in *ex parte* conversations with defense counsel once the plaintiff placed such conditions at issue in a lawsuit. *Id.* at 662. However, the court also made it clear that the physicians could not be compelled to participate in such discussions. *Id.* The court further limited *ex parte* communications in *Brandt v. Med. Def. Assocs.*, 856 S.W.2d 667 (Mo. banc 1993). Cautioning physicians taking part in *ex parte* communications, the court found that the *patient will have a cause of action for damages in tort if the physician discloses information* that is not related to the conditions at issue. *Id.* (italics added). Moreover, in *Luna v. Kennett HMA, Inc.*, 1:07CV00043, 2007 U.S. Dist. LEXIS 92410 (E.D. Mo. Dec. 17, 2007), the court recognized that the *Brandt* decisions were handed down ten years before the HIPAA Privacy Rules, 42 U.S.C. §§ 1320d-1(d), 1320d-3(a)-(b), 1320d-4(b), went into effect.[8] As such, the court questioned *Brandt's* validity, but stated that, because the HIPAA rules had been complied with in that case, it "need not determine at this time whether the HIPAA Privacy Rules preempt and supersede Missouri law as it stands after the *Brandt* decisions." *Id.* at *4.

[8] These Privacy Rules set forth standards and procedures for the collection and disclosures of protected health information. 45 C.F.R. § 164.512(e); *see* Section II (F) below.

**NEW YORK – Does not prohibit *ex parte* contacts.** After years of recognizing the sound public policy preventing a defendant from engaging in *ex parte* interviews of plaintiff's physician,[9] the Court of Appeals of New York recently reversed its position, allowing for these contacts. *See Arons v. Jutkowitz*, Nos. 147, 148, 153, 2007 N.Y. LEXIS 3355 (N.Y., November 27, 2007).

The foregoing makes clear that the overwhelming majority of the residence states in question prohibit *ex parte* communications. With respect to New York, which allows it, and to a lesser extent, Missouri and Nebraska, the Court must still determine whether to allow it as a discovery tool in this MDL litigation. As urged below, this MDL Court should take a conservative position on *ex parte* communications; one that can be applied consistently to all of the cases in this litigation regardless of the original forum. Since Defendants are able to obtain all relevant information without *ex parte* interviews, and these interviews are proscribed in most jurisdictions, the Court does nothing but invite potential problems and inequities by allowing them – even in the jurisdictions where they are not expressly forbidden.

## D. MDL Courts Rightfully Exercise Precaution When Determining Whether to Allow Informal Discovery by *Ex Parte* Communication.

The Federal Rules of Civil Procedure, and particularly Rule 16, give the court wide discretion in matters of case management. According to *Buffington v. Wood*, "[t]he clear dictate of this pretrial rule is to give the courts, through the issuance of pretrial orders, wide discretion and power to advance causes and simplify procedure before presentation of cases to juries." 351 F.2d 292, 299 (3d Cir. 1965); *see also, e.g., Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 91 (1st Cir. 1996) ("It is well settled that the trial judge has broad discretion in ruling on pre-trial management matters…"). Courts have recognized that permitting *ex parte* contacts in complex cases raises a host of management problems for the parties and the court. Those management problems are even more

---

[9] *See Anker v. Brodnitz*, 98 Misc. 2d 148 (N.Y. Misc. 1979); *Stoller v. Moo Young Jun*, 118 A.D.2d 637 (N.Y. App. Div. 1986).

acute in the context of MDL proceedings where the court must manage hundreds (if not thousands) of cases.

In the *Vioxx* MDL, the Honorable Judge Eldon E. Fallon, addressed this identical issue. *See In re Vioxx Prods. Liab. Litig.,* 230 F.R.D. 473 (E.D. La. 2005).[10] In that litigation, Judge Fallon issued an order preventing defendants from having *ex parte* communications with treating physicians relating to plaintiff's claims on a uniform basis. *See Id.* Judge Fallon reasoned that, in cases where the treating physician had contact with, or had something to do with, the event that allegedly caused the claimed injury, the treating physician has a dual role. Based upon this analysis, Judge Fallon reasoned:

> At first blush, the treating physicians in this case seem more like "fact" witnesses than expert witnesses. On closer scrutiny, however, it is clear that the physicians are both fact and expert witnesses. However, with regard to the former, the "facts" that the treating physician has knowledge of were discovered during the time of a private, privileged relationship. To release this information without the approval of the patient, other than in a deposition or pursuant to court order, would be in direct conflict with the time honored doctor-patient confidential relationship which has been recognized and protected in both Western and Eastern civilization for over 2000 years.

*Id.* at 476.[11] According to Judge Fallon, when a treating physician plays a role in implanting a device or prescribing a drug, there is a special relationship that exists between the physician and patient and any information obtained during this relationship should be confidential. *Id.* at 476-77. The Judge recognized that the confidential relationship between plaintiffs and physicians is subject to different laws of the separate fifty states; however, he found it appropriate to treat all the claims similarly for the purposes of the MDL case. Judge Fallon stated:

> Further, this MDL case involves the separate laws of fifty states, some of which provide for a broader physician-patient privilege than others. The Court realizes that

---

[10] The Vioxx Products Liability Litigation is a fifty-state MDL transferred to the Eastern District of Louisiana.

[11] Upon information and belief, Defendants have attempted to claim that a treating physician is a plaintiff's expert (and must submit an expert report) in a related case. As such, Defendants should not be allowed unfettered access to individuals that they may later claim to be expert witnesses for the plaintiffs.

> the physicians in this litigation are in a different position than in the typical personal injury case. This peculiarity, however, does not justify destroying the physician-patient relationship and all of the concerns that arise because of that relationship.

*Id.* at 477.

Several other examples of such a prohibition in MDL actions exist. In *Baycol*, 219 F.R.D. at 469, the Honorable Judge Michael J. Davis forbade *ex parte* contacts with treating physicians based upon state law; holding that state law clearly provided that physicians could not disclose any information without patients' consent, consumers had executed limited waivers that allowed manufacturer access to only their medical records (comporting with state law), and state law did not require or even allow manufacturer's *ex parte* access to physicians in absence of consumers' counsel). Likewise, in both *In re Prempro Prods. Liab. Litig.* [12] and *In re Human Tissue Prods. Liab. Litig.*,[13] the MDL courts determined that *ex parte* communications between defendants and plaintiffs' physicians were not appropriate.[14] In fact, the defendants in the *Human Tissue* MDL conceded that *ex parte* interviews were not appropriate under HIPAA. *See* Ex. C.

Moreover, allowing *ex parte* interviews in this MDL could result in additional, and unnecessary, procedural requirements and motion practice under the laws of the various states. For example, in *Smith v. Am. Home Prods. Corp. Wyeth-Ayerst Pharm.*, 855 A.2d 608 (N.Y. Super. Ct. Law Div. 2003), a pharmaceutical mass-tort case, the court concluded that New Jersey's procedure

---

[12] *See* Exhibit B, *In re Prempro Prods. Liab. Litig.*, MDL No. 4:03-CV-1507, Superseding Order re *Ex Parte* Physician Interview, September 16, 2005. This Order prohibits *ex parte* interviews of Arkansas residents (under Arkansas privilege law) and requires additional motion practice relating to the privilege law of other states before non-Arkansas residents' physicians may be interviewed. While this kind of limitation is commendable, Plaintiffs suggest that it makes more sense to simply prohibit these contacts absent formal discovery.

[13] *See* Exhibit C, *In re Human Tissue Prods. Liab. Litig.*, No. 2:06-135 (D.N.J.), MDL No. 1763, Order of September 11, 2006.

[14] Plaintiffs are aware that defense counsel argued and won a similar motion in *In re: Aredia and Zometa Prods. Liab. Litig.*, MDL # 1760, and will likely argue that the Middle District of Tennessee's ruling should be applied in this case. This opinion is merely another example of the lack of consensus among the courts addressing this matter.

for *ex parte* interviews would require "extensive hearings" and that the "inherent complexity" of that mass tort case mandated a "practical recourse." *Id.* at 625-27. Therefore, the court denied *ex parte* interviews altogether. *Id.* Consistent with this approach, in the New Jersey Vioxx litigation, the court would not permit *ex parte* communications between the defendant and the plaintiffs' treating physicians.[15] That court recognized that "given the large number of cases involved in this mass tort and even the larger number of doctors involved, the court would be unduly burdened by hearings to determine the permissible scope of each interview." Ex. A, at 7. In that case, unlike in this MDL, all of the Vioxx cases in front of the judge were subject to the law of one state, New Jersey. This MDL is national in scope and potentially involves thousands of cases. As such, allowing *ex parte* interviews in this litigation would pose the equivalent, if not additional complications. Only a uniform approach to such a complex docket makes sense from a standpoint of efficiency for the litigants and the Court.

## E. Courts Around the Country have Denied Similar Requests and for Good Reason.

While some States allow some form of *ex parte* interviews of a plaintiff's physician, most courts, including courts in the First Circuit,[16] have held that a defense attorney who contacts a plaintiff's treating physician without plaintiff's express consent (allowing *ex parte* discussions) violates state law, professional ethics, or the physician-patient privilege of confidentiality. *See, e.g., Harlan v. Lewis*, 982 F.2d 1255 (8th Cir.) cert. denied, 114 S. Ct. 94 (1993).[17]

---

[15] *See* Exhibit A, *In re Vioxx*, New Jersey Superior Court Case No. 619, Memorandum of Decision on Motion dated November 17, 2004.

[16] *See Neubeck v. Lundquist*, 186 F.R.D. 249 (D. Me. 1999).

[17] *See also., Horner*, 153 F.R.D. at 602; *Manion v. N.P.W. Med. Ctr.*, 676 F. Supp. 585 (M.D. Pa. 1987); *Alston v. Greater S.E. Cmty. Hosp.*, 107 F.R.D. 35 (D.D.C. 1985); *Weaver*, 90 F.R.D. 443; *Garner v. Ford Motor Co.*, 61 F.R.D. 22 (D. Alaska 1973); *Duquette v. Superior Court*, 778 P.2d 634 (Ariz. Ct. App. 1989); *Torres v. Superior Court*, 221 Cal. App. 3d 181 (Cal. Ct. App. 1990); *Neal*, 142 F.R.D. 325; *Miles v. Farrell*, 549 F. Supp. 82, 84 (N.D. Ill. 1982); *Gobuty v. Kavanagh*, 795 F. Supp. 281 (D. Minn. 1992); *Pourchot v. Commonwealth Edison Co.*, 587 N.E.2d 589, 591 (Ill. App. Ct. 1992); *Roosevelt Hotel Ltd. Partnership v. Sweeney*, 394 N.W.2d 353 (Iowa 1986); *Schwartz v. Goldstein*, 508 N.E.2d 97 (Mass. 1987); *Jaap v. Dist.*

These courts note that discovery limitations protect the doctor/patient confidences that are not relevant to the lawsuit, thereby protecting "society's interest in safeguarding the 'unique and confidential nature of the physician-patient relationship.'" *Harlan*, 141 F.R.D. at 111 (*quoting Crist,* 389 S.E.2d at 46). Courts have also warned that the use of *ex parte* interviews could encourage improper discussions or collusion between doctors and the attorneys defending their colleagues. *See Horner*, 153 F.RD. 597 (noting that an *ex parte* interview could develop into a "discussion of the impact of a jury's award upon a physician's professional reputation, [or] the rising cost of malpractice insurance premiums .... ").[18] A prohibition on *ex parte* interviews, these courts assert, does not prevent defense counsel from obtaining relevant material; it simply insures that only privileged information will be acquired. *E.g., Harlan*, 141 F.R.D. at 111. Finally, the courts explain that the application of state privilege law in federal litigation will discourage forum shopping which could result from disparate rules. *Gobuty*, 795 F. Supp. at 288 ("[T]here is no reason to afford the physician-patient relationship less protection in federal proceedings than in state proceedings."); *Johns*, 1997 U.S. Dist. LEXIS 17979. As such, numerous courts have held that defendant's counsel is limited to the formal methods of discovery. *See, e.g., Garner,* 61 F.R.D. 22.

**F. The Principles of HIPAA Prohibit *Ex Parte* Communications**

"Recognizing the importance of protecting the privacy of health information in the midst of the rapid evolution of health information systems," Congress in 1996 enacted the Health Insurance Portability and Accessibility Act of 1996, 42 U.S.C. § 1320d, et seq. ("HIPAA"). *South Carolina Med. Ass'n v. Thompson,* 327 F.3d 346, 348 (4th Cir. 2003). There is a real concern that HIPAA

---

*Court*, 191 Mont. 319, 623 P.2d 1389 (Mont. 1981); *Crist*, 389 S.E.2d 41; *Johnson v. Dist. Ct. of Okla. County*, 738 P.2d 151 (Okla. 1987); *Loudon v. Mhyre*, 756 P.2d 138 (Wash. 1988); *Johns,* 1997 U.S. Dist. LEXIS 17979; *Stewart v. Women in Cmty. Serv.*, CV-N-97-234, 1998 U.S. Dist. LEXIS 17741, 4-5 (D. Nev. 1998).

[18] *See also, Neal*, 142 F.RD. 325 (D. Colo. 1992); *Miles*, 549 F. Supp. at 84; *Gobuty*, 795 F. Supp. at 281; *Alston*, 107 F.R.D. 35; *Weaver*, 90 F.R.D. 443; *Garner*, 61 F.RD. 22; *Benally v. U.S.*, 216 F.R.D. 478 (D. Ariz. 2003).

could be violated by the treating physician or defense counsel during some *ex parte* interviews, even if only unintentionally. Indeed, one of HIPAA's goals was to "ensure the integrity and confidentiality of [patients'] information" and to protect against "unauthorized uses or disclosures of the information." 42 U.S.C. § 1320d-2(d)(2)(A) & (B)(ii). Congress directed the Secretary of the Department of Health and Human Services to promulgate the "Standards for Privacy of Individually Identifiable Health Information" ("Privacy Rules") to govern transactions under HIPAA. 65 Fed. Reg. 82462, 82462-63 (Dec. 28, 2000).[19] The Secretary noted that "[p]rivacy is a fundamental right" and that "[a]mong different sorts of personal information, health information is among the most sensitive." HIPAA rules, absent certain defined exceptions, expressly preempt any contrary provision of state law unless the state law "relates to the privacy of individually identifiable health information" and is "more stringent" than the HIPAA rules. 42 U.S.C. § 1320d-7(a)(1); 45 C.F.R. § 160.203(b).

Courts have interpreted HIPAA as prohibiting *ex parte* interviews of a plaintiff's treating physician by defense counsel in the absence of strict compliance with HIPAA. *Law v. Zuckerman*, 307 F.Supp.2d 705, 707 (D.Md. 2004). As Judge Fallon pointed out in the *Vioxx* MDL: "All of these concerns have led judges, such as the presiding judge in the currently-pending New Jersey Vioxx litigation, to prohibit defendant's *ex parte* communications with the plaintiff's treating physicians."

---

[19] The regulation has three major purposes:

> (1) To protect and enhance the rights of consumers by providing them access to their health information and controlling the inappropriate use of that information; (2) to improve the quality of health care in the U.S. by restoring trust in the health care system among consumers, health care professionals, and the multitude of organizations and individuals committed to the delivery of care; and (3) to improve the efficiency and effectiveness of health care delivery by creating a national framework for health privacy protection that builds on efforts by states, health systems, and individual organizations and individuals.

*Id.* at 82463.

*In re Vioxx Prods. Liab. Litig.*, 230 F.R.D. 470, 472 (D. La. 2005). After discussing *ex parte* contacts between defendants' counsel and plaintiffs' physicians under HIPAA, the court opined that "the just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting *ex parte* communications with Plaintiffs' treating physicians…." *In re Vioxx Prods. Liab. Litig.*, 230 F.R.D. 473, 477 (D. La. 2005).

As HIPAA does not expressly authorize *ex parte* communications between defense counsel and plaintiffs' physicians, courts have concluded that the statute's aims were better safeguarded by not permitting *ex parte* interviews – noting HIPAA's heavy emphasis on patient privacy. *Equal Opportunity Commission v. Boston Mkt. Corp.*, CV 03-4227, 2004 U.S. Dist. LEXIS 27338 (E.D.N.Y. Dec. 16, 2004).[20] As such, the strong public policy underlying HIPAA prohibits Defendants request to conduct *ex parte* interviews of Plaintiffs' physicians.

## III. PUBLIC POLICY CONSIDERATIONS

### A. The Sanctity and Trust of the Physician-patient Relationship Discourages these Unnecessary *Ex Parte* Communications.

As *ex parte* contacts can affect the fundamental privacy rights of injured victims, proper weight should be given to public policy and the effect of such communications. As noted above, Courts have recognized that public policy strongly favors the confidential and fiduciary relationship existing between a patient and his physician.

*i. The code of ethics recognizes the right to privacy absent a patient's consent.*

---

[20] In *Equal Opportunity Commission v. Boston Mkt. Corp.*, 2004 U.S. Dist. LEXIS 27338, the district court faced a similar situation. Defendant, Boston Market Corp., moved for an order permitting its attorneys to hold *ex parte* communications with two of plaintiff's psychologists. *Id.* at * 1. The court denied the motion, and held that "*ex parte* communications regarding the disclosure of health information, while not expressly prohibited by HIPAA, create . . . too great a risk of running afoul of that statute's strong federal policy in favor of protecting the privacy of patient medical records." *Id.* at *18. The court further noted that "HIPAA's limitation of the ways in which health information may be released is separate and apart from any claim of privilege that the plaintiff may have had or waived," and that "the strong policy underlying HIPAA would appear to trump the reasoning of those pre-HIPAA decisions that allowed defense counsel *ex parte* access to plaintiff's treating physicians." *Id.* at *20-21.

Moreover, the first indicia of a public policy prohibiting *ex parte* conferences is that found in the code of ethics which governs the conduct of the medical profession and upon which the public relies to be faithfully executed. The code of ethics for the medical profession is comprised of three separate prongs: (1) the Hippocratic Oath;[21] (2) The American Medical Association's (AMA) Principles of Medical Ethics;[22] and (3) The Current Opinions of the Judicial Counsel of the AMA (1984 ed.). These three prongs underscore the highly confidential nature of the physician-patient relationship and, perhaps more importantly, affirmatively advertise to the public that a patient can properly expect his physician to protect those medical confidences which are disclosed during the physician-patient relationship. For example, Section 5.05 of the Current Opinions states: "[t]he information disclosed to a physician during the course of the relationship between physician and patient is *confidential to the greatest possible degree*…the physician should not reveal confidential communications or information without the *express consent of the patient*, unless required to do so by law." (Italics added). Here, clearly such consent has not been given. Thus, conduct which threatens the fiduciary relationship existing between a patient and his physician should not be allowed.

*ii. There is a chance of collusion and unintentional waivers of privilege.*

Courts have also expressed fear that the use of *ex parte* interviews could encourage improper discussions or collusion between doctors and the attorneys defending their colleagues. *Manion,* 676 F. Supp. at 593 (*ex parte* interviews could develop into a discussion of the impact of a jury's award

[21] The Oath states: "Whatever, in connection with my professional practice or not in connection with it, I see or hear, in the life of men, which ought not to be spoken abroad, I will not divulge, as reckoning that all such should be kept secret."

[22] Principle II of the AMA Principles of Medical Ethics state in relevant part: "A physician shall deal honestly with his patients and colleagues." Principle IV states: "A physician shall respect the rights of patients, of colleagues, and of other health professionals, and shall *safeguard patient confidences* within the constraints of the law." (Italics added). These principles are the ethical guidelines of the physician and dictate that the physician owes his patient an obligation of honesty and confidentiality.

upon a physician's professional reputation, or the rising cost of malpractice insurance premiums). However, during an *ex parte* interview, a violation of a plaintiff's privacy interests and a breach of a physician's fiduciary duty does not require nefarious intentions. Without knowing the nature of the confidential information beforehand, defense counsel may unknowingly elicit a response containing information outside the scope of the plaintiff's waiver of privilege. The physician should not be required to decide what ought to be disclosed. As one court put it: "[a]sking the physician, untrained in the law, to assume this burden is a greater gamble and is unfair to the physician." *Roosevelt Hotel Ltd. Partnership*, 394 N.W.2d at 357.[23]

**B. *Ex Parte* Communications Could Expose Physicians to Potential Civil Liability.**

Confidentiality is guarded not only by the patient's evidentiary privilege, but also by the confidentiality requirements of state medical licensing laws, statutory safeguards surrounding medical records and patient information, and recognition by some states of tort liability for disclosure of patient confidences. In these states, courts have noted that a reason for refusing to allow private, *ex parte* interviews between defense counsel and physicians is the potential for doctors to be exposed to tort liability for breach of the patient's right to privacy or to professional discipline for unprofessional conduct. *See, e.g., Alexander v. Knight,* 177 A.2d 142, 146 (Pa. 1962)(a physician's fiduciary duties include "a duty to refuse affirmative assistance to the patient's antagonist in litigation"); *Hammonds v. Aetna Cas. & Sur. Co.,* 243 F.Supp. 793, 799 (N.D.Ohio 1965) ("during the course of [litigation], in addition to the duty of secrecy, there arises the duty of undivided loyalty."); *Miles*, 549 F.Supp. at 84; *Perkins,* 877 F. Supp. at 333-334; *see also*, *Wenninger v. Muesing,* 240 N.W.2d 333 (Minn. 1976). In light of this, some courts have held that needless

---

[23] *Accord, Harlan,* 141 F.R.D. at 109 ("The physician, largely unschooled in legal matters, cannot be expected to make the sometimes difficult determination of what matters are relevant to the plaintiff's claims."); *see also, Horner*, 153 F.R.D. 597.

lawsuits for breach of confidence may be avoided by the prohibition of *ex parte* interviews of treating physicians by a defendant. *See Anker*, 98 Misc. 2d 148.

## IV. DEFENDANTS' ARGUMENTS FAIL

### A. Defendants' Due Process Rights are Not in Danger.

Defendants provide no evidence demonstrating *why ex parte interviews are necessary*, and do not explain how they will be denied access to relevant non-privileged information without being allowed these covert discussions with Plaintiffs' physicians. Defendants merely assert that it would be unfair, and thus, violate their right to due process. If nothing more is required, this same argument could be made in every civil case filed - essentially creating a constitutional right to *ex parte* communications with a plaintiff's treating physician. Citing only general principles of due process, Defendants assert that *ex parte* interviews are necessary to protect their right to due process and to insure a "level playing field." Defts' Brief, p. 9. This same "level playing field" argument was rejected by the court in the *Baycol* MDL. *Baycol*, 219 F.R.D. at 469. Additionally, the argument comes apart on a single indisputable fact: *ex parte* interviews cannot provide defense counsel with any legitimate information that counsel could not obtain by other means.[24] All relevant medical records and documents have or will be produced through conventional methods of discovery and the treating physicians are subject to subpoena. Plaintiffs have not asserted "continued and exclusive access to the key witnesses" as Defendants claim; and Defendants have not identified a single piece of evidence which can be *properly* obtained through *ex parte* communications but cannot be obtained

[24] *Alston*, 107 F.R.D. at 37 n. 3 ("any meaningful information could also be ascertained preliminarily by a few questions using the procedure of deposition upon written questions pursuant to Rule 31"); *Nelson v. Lewis*, 534 A.2d 720, 723 (N.H.1987) ("The defendant has given us no reason to believe that he cannot obtain all necessary information through the formal discovery methods for which our procedural rules provide."); *Petrillo v. Syntex Laboratories, Inc.*, 499 N.E.2d 952, 956 (Ill. App. Ct. 1986) ("it is undisputed that *ex parte* conferences yield no greater evidence, nor do they provide any additional information, than that which is already obtainable through the regular methods of discovery"); *see also*, *Karsten v. McCray*, 509 N.E.2d 1376, 1384 (Ill. App Ct. 1987); *Smith v. Ashby*, 743 P.2d 114 (N.M. 1987); *Loudon*, 756 P.2d 138; *Harlan*, 141 F.R.D. at 111.

by ordinary discovery. Significantly, ADR Plaintiffs have already provided defense counsel with medical records and detailed PFSs. Indeed, every aspect of treatment and every opinion of the doctors can be explored in detail at a deposition. The damage inflicted by *ex parte* communications upon the physician-patient relationship (as well as the pressures it generates on counsel and physicians) is not worth any meager benefits derived from their use. With all the available tools of formal discovery, *ex parte* meetings are simply unnecessary. Plaintiffs do not assert a proprietary right to the information that the physicians may have; they merely request that discovery be taken above the table and out-in-the-open, using conventional methods which will afford the protection of the adversarial process.

**B. There are No Real Savings and Any Potential Savings in Cost is Far Outweighed By Plaintiffs' Privacy Interests.**

It is not clear that *ex parte* discussion ultimately results in the conservation of resources, as depositions are not the sole alternative to *ex parte* interviews. As several courts have pointed out, interrogatories and depositions upon written questions are less expensive substitutes. *State ex rel. Woytus v. Ryan*, 776 S.W.2d 389, 394 (Mo. 1989); *Alston,* 107 F.R.D. at 37 n. 3. What's more, this Court has already taken substantial measures to ensure a streamlined and efficient discovery process. Among other things, this litigation has been consolidated and transferred by the Judicial Panel on Multidistrict Litigation ("JPML") to Davols' home state and the Court has selected ten exemplary cases for early alternative dispute resolution - in an effort to encourage early resolution of the litigation as a whole. Unlike these legitimate and effective cost reducing measures, allowing for *ex parte* communications with Plaintiffs' treating physicians will bring no real savings to any party involved. Moreover, *ex parte* interviews could possibly increase the cost of this litigation by spawning otherwise unnecessary motion practice and costs for the parties to bear – as Plaintiffs will want to be present at all interviews. Indeed, it is not hard to imagine a situation where the

discussions between defense counsel and the physicians exceed the scope of relevancy in this litigation, or create a conflict of interest. Situations like this would undoubtedly require the parties to bring the dispute before the Court for resolution. This is a recipe for contention and unnecessary motion practice.

In any event, the possibility that *ex parte* interviews would be less expensive and time consuming is not a sufficient justification for jeopardizing Plaintiffs' privacy interests and risking violations of the physicians' professional responsibilities. *Nelson,* 534 A.2d at 723 ("while *ex parte* interviews may be less expensive and time-consuming than formal discovery . . . these interests are insignificant when compared with the patient-plaintiff's interest in maintaining the confidentiality of personal and possibly embarrassing information, irrelevant to the determination of the case being tried."); *see also Crist,* 389 S.E.2d at 46-47. Small monetary gains cannot outweigh the societal interests in protecting the confidential and fiduciary nature of the physician-patient relationship.[25]

**C. Defense Counsel's Work Product is Not at Risk.**

Defendants cite to no case law supporting their assertion that prohibiting *ex parte* communications with Plaintiff's physicians will improperly reveal protected attorney work product.[26]

---

[25] Defendants cite to several cases in support of their argument that *ex parte* interview will lead to greater efficiency. Those cases are distinguishable from this litigation. First, *IBM v. Edelstein*, 526 F.2d 37 (2d. Cir. 1975), dealt with an *ex parte* interview of a company's CEO, and therefore, did not involve the physician-patient privilege. Second, in *Williams v. Rene*, 72 F.3d 1096, 1103 (3rd Cir. 1995), the court determined that the plaintiff had previously executed a release that would permit an *ex parte* interview. Next, in *Eve v. Sandoz Pharms. Corp.*, 2002 WL 32153352, the court allowed *ex parte* interviews of physicians who had already been deposed (solidifying their testimony) in preparation for trial. Finally, the validity of *Doe v. Eli Lilly & Co.*, 99 F.R.D. 126 (D.D.C. 1983), is questionable in light of the court's subsequent holding in *Alston,* 107 F.R.D. 35 (prohibiting *ex parte* contacts).

[26] Defendants cite to cases such as *Hickman v. Taylor*, 329 U.S. 495 (1947) and *In re Grand Jury Subpoena Dated November 8, 1979*, 622 F.2d 933 (6th Cir. 1980), for broad principles relating to the attorney work product doctrine. Admittedly, an attorney's work product information should be afforded due protection. However, Defendants can offer no justification for its application here. Defendants' citation to *Weiss*, 2007 WL 2137782, and *Hancock*, 958 F.2d 1367 are misplaced, as neither of those cases so much as mentions the work product doctrine. Finally, *IBM*, 256 F.2d 42, is not applicable because it deals with disclosure of an attorney's private interviews of a non-physician witness who had no privilege or duty of confidentiality to the plaintiff.

To the contrary, if Defendants are prohibited from conducting *ex parte* interviews of Plaintiffs' physicians, it only stands to reason that no work product can possibly be revealed. Any argument that defense counsel will not be free to ask the physicians all of the questions they would like to (with Plaintiffs' counsel in the room) is precisely the reason why Plaintiffs need to "have a seat at the table" when Defendants are present. Formal discovery assures the plaintiff's lawyer access to the information provided to the defendant and an opportunity to challenge improper lines of inquiry. Thus, the adversarial process, which necessitates the limited exception to confidentiality, also ensures that information provided to defendants during this discovery stays within its proper limits

**D. Plaintiffs Should Not be Prevented from Contacting their own Physicians.**

Defendants argue that, should they not be permitted *ex parte* contacts with Plaintiffs' physicians, then Plaintiffs should also be prohibited from contact their own physicians. Defs' Brief, p. 9, n.3. Defendants' argument that there should be a mutuality of access to the Plaintiffs' physicians overlooks the fact that the physicians are not neutral witnesses. They owe a preexisting duty of confidentiality to the patient-plaintiffs. A physician meeting with a plaintiff does not jeopardize a duty to the defendant. It is only the rights of Plaintiffs that are at risk. HIPAA makes a person the gatekeeper of his or her protected health information. *See* 45 C.F.R. § 164.508(a)(1). The patient-plaintiff is the holder of the privilege; entitled to assert its protection as she sees fit. *See Scott by & Through Scott v. Flynt*, 704 So. 2d 998, 1004 (Miss. 1996) ("...patient is deprived of this right when a physician is allowed to speak *ex parte* because the physician then decides how, when and what information is to be waived when he is not the holder of said privilege."); *see also Jaap*, 623 P.2d 1389. As such, Plaintiffs have the right to authorize their attorneys to communicate with their doctors. Plaintiffs have engaged counsel – forming confidential fiduciary relationships – for the

purpose of protecting their rights.[27] Defense counsel, being adverse to Plaintiffs, occupies an entirely different position. Plaintiffs' counsel and defense counsel do not, and cannot, have equal relations with Plaintiffs' treating physicians.[28]

## V. CONCLUSION

Based on the foregoing, this Court should deny Defendants' Motion Seeking *Ex Parte* Contacts With Plaintiffs' Treating Physicians and enter an order prohibiting *ex parte* contacts with Plaintiffs' present and former treating physicians.

Dated: January 14, 2008

/s/ Donald A. Migliori

Donald A. Migliori
RI Bar#4937
MOTLEY RICE LLC
321 South Main Street
P.O. Box 6067
Providence, RI 02940
401-457-7700
401-457-7708 Fax

Teresa E. Toriserva
Nancy C. Wilkins
WEXLER TORISEVA WALLACE LLP
1446 National Road
Wheeling, WV
304-238-0066
304-238-0149 Fax

[27] Section 5.06 of the Current Opinions of the Judicial Counsel of the AMA deals specifically with the attorney-physician relationship (again reiterating the requirement of patient consent): "The patient's history, diagnosis, treatment, and prognosis may be discussed with the patient's lawyer with the consent of the patient or the patient's lawful representative."

[28] Recently, in the *Vioxx* MDL, Judge Fallon addressed this very issue. The court had originally entered an order requiring *any* attorney wishing to interview a treating physician to inform the other parties of the interview in advance, so that they might attend. The court later modified the order as to plaintiffs' counsel: only requiring plaintiffs to provide notice of communications with plaintiffs' physicians if those physicians were named as defendants. *See In re Vioxx Prods. Liab. Litig.*, 230 F.R.D. 473 (D. La. 2005).

Ernest Cory
Jon C. Conlin
Stephen R. Hunt, Jr.
CORY WATSON CROWDER & DEGARS P.C.
2131 Magnolia Ave.
Birmingham, AL 35209
205-328-2200
205-326-7896 Fax

Edward A. Wallace
Mark R. Miller
WEXLER TORISEVA WALLACE LLP
55 West Monroe, Suite 3300
Chicago, IL 60603
312-346-2222
312-346-0022 Fax

**CERTIFICATE OF SERVICE**

I, Donald A. Migliori, hereby certify that a copy of the foregoing **Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion Seeking *Ex* Parte Contacts with Plaintiffs' Treating Physicians** was electronically filed. Those attorneys who are registered with the Electronic Filing System may access these filings through the Court's System, and notice of these filings will be sent to these parties by operation of the Court's Electronic Filing System.

Dated: January 14, 2008

By: /s/ Donald A. Migliori

Donald A. Migliori
MOTLEY RICE LLC
321 South Main Street
P.O. Box 6067
Providence, RI 02940-6067
401-457-7700
401-457-7708 Fax